Donald M. Jacobsen v. Commissioner.
Jacobsen v. Commissioner
Docket No. 3377.
United States Tax Court
1945 Tax Ct. Memo LEXIS 260; 4 T.C.M. (CCH) 333; T.C.M. (RIA) 45103; March 23, 1945
*260 Irving G. Brown, Esq., 105 S. La Salle St., Chicago 3, Ill., for the petitioner. D. F. Long, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent has determined a deficiency in petitioner's income tax for the year 1941 in the amount of $3,139.49. This deficiency resulted from respondent's determination that petitioner was the owner of a demand note executed by The Sarjem Corporation the payment of which resulted during the taxable year in a gain of $5,041.67. This gain respondent included in petitioner's taxable income. Findings of Fact Petitioner and his wife, Edna R. Jacobsen, were residents of Illinois during the taxable year, and at all times material to this proceeding. Petitioner filed his income tax return for the year 1941 with the collector of internal revenue for the first district of Illinois. Petitioner was, and is, the president and principal stockholder of D. M. Jacobsen Co., which is engaged in the wholesale produce business with offices in Chicago, Illinois. In 1941, The Sarjem Corporation was engaged in a financing business which involved the purchase and sale of utility and quasi-utility properties. Its main *261 office was in New York City, but it had a subordinate office in Chicago. This was in the suite of offices occupied by Frederick A. Thulin, an attorney and certified public accountant. Mr. Thulin was a director of The Sarjem Corporation, and did some of its legal work and supervised its tax returns. He also acted as attorney and accountant for petitioner and for petitioner's company. As petitioner's accountant, Mr. Thulin was familiar with the amount of petitioner's income and knew that his income for the taxable year would be in the approximate amount of $50,000. Mr. Thulin was acquainted with petitioner's wife, who was a housewife without any business experience and who had never had any taxable income. Mr. Thulin had not represented petitioner's wife in any business transaction. In August 1941, The Sarjem Corporation was in need, temporarily, of funds and wished to borrow $15,000 for which it was willing to pay a premium of $5,000 and give as collateral security an assignment of a certain contract concluded by it a few weeks previously involving the financing of the sale of a bridge property. Petitioner refused to make the loan directly to The Sarjem Corporation. Mr. Thulin *262 suggested that petitioner might advance the money to his wife who could then make a loan of this amount to The Sarjem Corporation. Petitioner's wife had no money or property of her own other than an expectancy as one of the heirs of her mother's estate. Subsequent to the taxable year she realized approximately $10,000 from this source. At the time of the transaction in question she hoped that she would inherit around $25,000. After petitioner's first conversation with Mr. Thulin he talked the matter over with his wife and the next morning Mr. Thulin called her by telephone and explained the transaction to her. It was thereupon agreed that petitioner would advance $15,000 to his wife who would then make a loan in this amount to The Sarjem Corporation, the latter corporation to execute its note to Mrs. Jacobsen in the sum of $20,000. Petitioner so informed Mr. Thulin by telephone on the day after his first conference on the matter and later went to Mr. Thulin's office where he instructed him to prepare all the necessary papers. These consisted of a note payable to petitioner in the sum of $15,000 to be signed by his wife, a note payable to petitioner's wife in the sum of $20,000 to be *263 signed by The Sarjem Corporation, and the assignment of a contract by The Sarjem Corporation which was to be collateral security for the payment of its note. Mr. Thulin informed petitioner that The Sarjem Corporation required the money it desired to borrow immediately without the delay incident to the clearing of individual checks, and therefore told petitioner that he should purchase a cashier's check payable to The Sarjem Corporation. Petitioner thereupon went to his bank and purchased with his own funds a cashier's check in the amount of $15,000 payable to The Sarjem Corporation. This he delivered to Mr. Thulin who thereupon gave him a note properly executed by The Sarjem Corporation payable to petitioner's wife in the sum of $20,000, together with the assignment of the contract as collateral. Mr. Thulin also gave to petitioner a note which he had prepared for Mrs. Jacobsen's signature calling for the payment to petitioner of $15,000. Petitioner took the papers home with him. Mrs. Jacobsen then signed the $15,000 note and petitioner placed all of the papers in his safe deposit box at the Northern Trust Co. The Sarjem Corporation note and assignment in an envelope marked "property *264 of Edna R. Jacobsen" were deposited in petitioner's box with the consent of Mrs. Jacobsen. She did not have a safe deposit box of her own at the time. The papers were kept in this box continuously until the notes were paid. Mrs. Jacobsen did not have access to this box. The Sarjem Corporation note was not endorsed. On or about September 29, 1941, the petitioner received a letter addressed to his wife in care of petitioner at his business address, which contained a check of The Sarjem Corporation payable to petitioner's wife in the sum of $20,116.67. This check was in payment of The Sarjem Corporation note referred to above, plus interest in the amount of $116.67. Petitioner took this check home to his wife and she opened up a checking account with it. After receiving this check petitioner removed The Sarjem Corporation note for $20,000 from his safety deposit box and personally delivered it to Mr. Thulin who marked the note "paid". Before opening this checking account, the petitioner's wife had not had a checking account for over a year. The first checks drawn by her on this checking account were prepared for her signature by the petitioner. These checks were dated October 1, 1941. The *265 first was made payable to the petitioner in the amount of $15,000, and the second was payable to him in the sum of $75. The latter check was in payment of interest called for by the note of petitioner's wife payable to petitioner. Upon receiving these checks petitioner marked the note "paid" and returned it to her. The checking account opened by petitioner's wife on or about October 1, 1941, was not subject to withdrawal by petitioner. After drawing the two checks to petitioner on that date, petitioner's wife drew against the balance from time to time in payment of various personal and household expenses. Whenever these expenditures were called to petitioner's attention he reimbursed his wife on account thereof from his personal funds. Petitioner exercised no control over his wife's use of this checking account. Petitioner's auditor prepared the tax returns of petitioner and his wife for the year 1941 from information furnished by petitioner. In the return for petitioner's wife was included the gain resulting from the payment of The Sarjem Corporation note. In petitioner's return was included the $75 received by him as interest on his wife's note. The net taxable income of petitioner *266 as shown on his return was the sum of $57,366.68. Petitioner was, in realty and for tax purposes, the owner of The Sarjem Corporation note at the time it was paid, and the gain resulting from its payment was properly taxable to him. Opinion KERN, Judge: The question presented by the instant case is purely factual and is to be resolved not only from the oral testimony adduced but also from the circumstances shown by the record. That question is whether, in reality, petitioner loaned money to The Sarjem Corporation, and arranged that the income resulting therefrom should be paid to his wife, or the formalities truly represented the realities, and petitioner made a loan to his wife who, in turn, made a loan to The Sarjem Corporation so that the gain resulting from the transaction was taxable to her. Petitioner testified that he was unwilling to make the loan to The Sarjem Corporation himself because he was in the fruit business, and "could see no point in having something else to worry about," and, on cross-examination, when he was asked if his motive in molding the transaction into the form it finally took was not to avoid the heavy surtaxes upon the gain anticipated on the loan, *267 he answered: "That was not my motive. I knew I was going to make fifty some odd thousand, but I have plenty to worry about in my own business, and I don't like the idea of worrying about other things." When we consider the complexity of the transaction as it was finally worked out, the activities of petitioner incident thereto, and the fact that, if the transaction had full reality, it jeopardized his wife's entire personal fortune, we are unable to believe that the motive which gave rise to the transaction was to save petitioner from worry. After a consideration of all the circumstances shown by the record, we conclude that, in reality, petitioner made the loan to The Sarjem Corporation and arranged for a repayment of the principal to himself and a payment of the income resulting therefrom to his wife, and that his motives were two-fold, first, to avoid the considerable surtaxes which would have been payable if the income had been reported by him, and, second, to accomplish a gift to his wife so that she would have money of her own. To paraphrase the language of the Supreme Court in the recent case of (March 12, 1945): *268 A loan by one person can not be transferred for tax purposes into a loan by another by using the latter as a conduit through which to pass the money loaned. "To permit the true nature of a transaction to be disguised by mere formalities, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." Ibid. Decision will be entered for respondent.